ASSANTE *v.* CHARLESTON BRIDGE Co. *et al.*

(*District Court, D. South Carolina.* January 25, 1890.)

NAVIGABLE WATERS—BRIDGES—WIDTH OF DRAW.

A bridge company was incorporated by the legislature of South Carolina with authority to build a bridge across Ashley river, "and there shall be a draw in said bridge in the channel of the river in such place as the same is deepest and most easily navigable, not less than 30 feet wide, for the passage of vessels through said bridge." *Held,* that if the bridge be not built directly across the current, perpendicular to it, then it must leave a clear width of 30 feet open across the channel, estimating with reference to its curve and the obliquity of the bridge.

In Admiralty. Petition for rehearing decree.

*J. P. K. Bryan,* for libelant.

*Mitchell & Smith* and *John F. Fickin,* for respondents.

SIMONTON, J. This was a libel *in personam* against the bridge company and the owner of the tug. The latter was engaged in towing the brig through a draw of the bridge, when the brig collided with the fenders of the bridge. The decree filed 10th December, 1889, (40 Fed. Rep. 765,) stated that it was impossible to decide, from the conflicting evidence of unimpeached witnesses, whether the collision was not due to a sheer made by the brig, sudden, unexpected, and not accounted for; that, if it were due to this sheer, the tug was not responsible; that for the same reason no decree could be made as to the lawful character of the bridge. The libel charged that the draw of the bridge was made obliquely across the current; that this was unlawful, and contributed to the collision. The decree proceeded upon the idea that, if the collision was due to the sheer, the brig alone was in fault. The accident, therefore, would not have been caused by the conduct of the tug, nor by any obliquity in the bridge. The judge not being able to say from the evidence that it was not due to the sheer, the libel was dismissed. The libelant files his petition for a rehearing of so much of the case as relates to the bridge. It proceeds on this ground: If the bridge is not lawfully constructed, it had no right to be where it was in the channel of a navigable stream; that had it not been there the brig would have escaped collision with it, even if it did sheer. Thus, being there, it contributed to the injury, and, if unlawfully there, must bear its share of the damages. *Atlee* v. *Packet Co.,* 21 Wall. 394; *Jolly* v. *Draw-Bridge Co.,* 6 McLean, 246. I feel the force of this argument, and have heard counsel on the point suggested. Is this bridge lawfully constructed? It is across a navigable stream of the United States, but, in the absence of legislation by congress, states may authorize bridges across navigable streams by statutes so well guarded as to protect the substantial rights of navigation. *Gilman* v. *Philadelphia,* 3 Wall. 713. Or, as it has been put, no state can permit an obstruction of the navigable waters of the United States. But, although every bridge having piers *ex necessitate* is more or less an obstruction, still it may be built

if a passage is reserved of sufficient width for the purposes of foreign and domestic commerce. This passage the draw affords. See, also, *Jolly* v. *Draw-Bridge Co.*, 6 McLean, 242. In *Transportation Co.* v. *Chicago*, 107 U. S. 687, 2 Sup. Ct. Rep. 185, this subject is discussed. The distinction between navigable streams lying between or passing through several states and such streams lying wholly within a single state is clearly drawn. As to this latter class, among which is the Ashley river, the rule is laid down that the legislature of a state can impose such regulations and limitations upon the erection of obstructions in navigable streams wholly within its limits as might best accommodate the interests of all concerned, until congress shall interfere. "* * * Bridges over navigable streams which are entirely within the limits of a state are of this class. The local authority can better appreciate their necessity, and can better direct the manner in which they shall be used and regulated, than a government at a distance." We look, then, to the legislature of the state, and especially to its provisions as to the draw, these being the means adopted by the state to prevent an unlawful obstruction to navigation.

The Charleston Bridge Company was incorporated by an act of assembly of South Carolina in December, 1808, with authority to build across Ashley river a bridge at least 25 feet wide, "and there shall be a draw on said bridge in the channel of the river in such place as the same is deepest and most easily navigable, not less than 35 feet wide, for the passage of vessels through said bridge." 9 St. at Large S. C. 434. In 1810 the act was amended making the draw 30 feet. Id. 449. The word "across," used in an act like this, has received construction. Used alone, it means "straight across,"—neither obliquely nor diagonally. *Hannibal & St. J. R. Co.* v. *Missouri River Packet Co.*, 125 U. S. 260, 8 Sup. Ct. Rep. 874. If this bridge were built directly across this river, the draw must be in the clear, between the pivotal pier and the other piers, at the least 30 feet. Id., 125 U. S. 267, 8 Sup. Ct. Rep. 878. If, however, the bridge be not built directly across the current, perpendicular to it, then it must leave a clear width of 30 feet open across the channel, estimating with reference to its curve and the obliquity of the bridge. *Columbus Insurance Co.* v. *Peoria Bridge Ass'n*, 6 McLean, 72; *Hannibal & St. J. R. Co.* v. *Missouri River Packet Co.*, 125 U. S. 269, 8 Sup. Ct. Rep. 879. The draw—each draw—of this bridge is 76 feet. In order to ascertain whether there is a clear width of 30 feet open across the channel, estimating with reference to its curve and the obliquity of the bridge, "we must know the angle, if any, made by the current with the pier of the bridge," especially at three-quarters flood. But one witness speaks to this point on the part of libelant. Most of them say that the current runs under the bridge at an angle, without giving its size. One of them puts the angle at 40 degrees, but does not state the time or character of the tide. The one witness who speaks to the point directly is Capt. Brown, of the light-house steamer Wisteria. He formed his conclusion from an experiment made with a chip on the morning on which he gave his testimony. He visited the bridge for the purpose, got there at three-

quarters flood, and threw a chip overboard. He concluded that the current passed under the bridge at that stage of the tide with a velocity of 2 to 3 knots an hour, and at an angle of 20 to 22, $1\frac{3}{4}$ to 2 points of the compass. He is an excellent witness, and worthy of all credit. On the other hand, Mr. James Allen, assistant engineer in the coast survey, made a careful experiment with all appliances, at this bridge, at various stages of the tide, including three-quarters flood. He found little or no current at that stage of the flood-tide, and its direction was, as far as he could observe, parallel to the pivot pier. He also is a man of character and ability. It is manifest that the current varies at times, depending chiefly on the winds, and perhaps the character of the tide,—spring-tides, neap-tides, ordinary tides. The bridge itself is in evidence, and has been examined. I prefer, however, further evidence on these two points: What is the angle, if any, that is made by the current of Ashley river with this bridge at three-quarters flood-tide? Allowing for this angle, what is the clear width open across the channel, estimating with reference to the obliquity of the bridge? Let the case be referred to Mr. Seabrook for this purpose.